Duane CRITHFIELD, Appellant,

v.

William A. BOOTHE, M.D., Wendy J. Boothe, W.A. Boothe Family, Ltd., GVLP, LLC, DVLP, LLC, NVLP, LLC, and RVLP, LLC, Appellees.

No. 05–10–00789–CV.

Court of Appeals of Texas, Dallas.

May 31, 2011.

James W. Grau and Scott A. Whisler, Grau Loen, P.C., Dallas, for Appellant.

Stephen F. Malouf, Johnathan Nockles, David W. Evans, The Law Offices of Stephen F. Malouf, P.C., Amy Brooks Ganci, Ganci, LLP, William Ross Forbes, Jr., Jude T. Hickland, Jason P. Shanks, Minoo M. Sobhani, William D. Ellerman, Jackson Walker, L.L.P., Jason A. Copling, Munsch Hardt Kopf & Harr, P.C., Charla G. Aldous, Brent R. Walker, Aldous Law Firm, Brian P. Lauten, The Lauten Firm, P.C., James A. Fisher, Fisher Holmes & Welch, PC, Dallas, Jeffrey Thomas Knebel, Osborne, Helman, Knebel & Deleery, L.L.P., Austin, for Appellees.

Before Justices MORRIS, O'NEILL, and FITZGERALD.

## OPINION

Opinion By Justice O'NEILL.

In this interlocutory appeal, appellant Duane Crithfield, a Florida resident, appeals the trial court's order denying his special appearance. In his first two issues, he alleges the appellees have failed to plead sufficient facts to bring him under the Texas long-arm statute, and he does not have minimum contacts with Texas; therefore, exercise of jurisdiction over him does not comport with traditional notions of fair play and substantial justice. In his third issue, he challenges the sufficiency of the trial court's findings of fact and conclusions of law to support jurisdiction. Lastly, he contends the trial court failed to make findings as to the individual elements for each of the appellees' causes of action. We reverse the trial court's denial of Crithfield's special appearance to the extent it involves appellees GVLP, LLC, DVLP, LLC, NVLP, LLC, and RVLP,

LLC's (collectively the Ventos) alter ego claim. In all other respects, the trial court's order is affirmed.

## Background

This case involves numerous parties, lawsuits, and a previous appeal stemming from an interpleader action in which Compass Royalty Management, LLC (Compass) alleged it had received competing claims to certain oil and gas royalties and requested a declaration from the trial court regarding the parties' rights and duties with respect to the royalty payments.[1] The parties involved in this appeal are appellees William A. Boothe, M.D., Wendy J. Boothe, W.A. Boothe Family, Ltd. (collectively the Boothes) and the Ventos. The Boothes are residents of Dallas, Texas and the Ventos are Nevis corporations. Because the Boothes' and the Ventos' involvement in the underlying lawsuit revolve around separate facts, we will address them individually.

### A. The Boothes

The Boothes invested into funds that, through a serious of complicated transactions, were used to purchase oil and gas interests from Noble Royalties, Inc. (Noble), an entity headquartered in Dallas, Texas.

The Boothes invested approximately $2,000,000 into a "Fixed 8 Fund" offered by Westminster Hope & Turnberry (WH & T), a company owned by Alliance Holding Co., Ltd.[2] Crithfield is the director for both WH & T and Alliance Holding Co., Ltd. On WH & T's website, it represented to clients and prospective clients that

---

1. See *Alliance Royalties, LLC v. Boothe*, 329 S.W.3d 117 (Tex.App.-Dallas 2010, no pet.).

2. Crithfield considered WH & T a subsidiary of Alliance Holding Co., Ltd.

Alliance Royalties, LLC purchased royalty interests through Noble.[3]

The Fixed 8 Fund was represented to the Boothes as a no-risk guaranteed investment, and WH & T guaranteed the eight percent return for the Fixed 8 fund. In May of 2007, Crithfield sent a letter to Terry Lustig, the Boothes' estate attorney, stating Alliance Holding Co., Ltd. had no debt and WH & T maintained sufficient assets to satisfy its obligation in the Fixed 8 Fund. In December, the Boothes learned the Fixed 8 Fund had lost value.

In June of 2008, Crithfield visited the Boothes in Dallas. Crithfield represented the Noble royalties had value, and Dr. Boothe requested whatever royalties had value be transferred to him. Crithfield told him, "I don't know why you would want them, they're only paying 2 percent." Dr. Boothe persisted in his request because he felt two percent was better than nothing. Crithfield agreed to the transfer. It was later determined the Noble royalties were yielding over ten percent a year.

Eventually, the Boothes entered into contracts that, if fully performed, would have provided for transfer of the royalty interests. In the agreements to transfer the royalty interests, Crithfield represented that Alliance Royalties, LLC owned the Noble interests but in fact, Alliance Royalties, Inc. owned them. Thus, Alliance Royalties, LLC never owned any royalties it could transfer to the Boothes. Further, Crithfield was the president, sole director, and sole employee of Alliance Royalties, Inc.

As further background, Crithfield testified during a deposition that Alliance Royalties, LLC invested in notes of Alliance Royalties, Inc. and Alliance Royalties, Inc.

purchased Noble's interests. Alliance Royalties, Inc. made interest payments from the earnings of the Noble royalties. It collected the payments and paid them to Alliance Royalties, LLC. But, he claimed Alliance Royalties, LLC held no royalties in Noble. Based on these actions, the Boothes claimed Crithfield defrauded them out of their investment and royalties.

The underlying lawsuit began when Compass filed an interpleader action to determine ownership of certain royalties after receiving competing claims from the Alliance entities, the Boothes, and the Ventos. The Boothes filed third party claims against the Alliance Entities and Crithfield, which included, among other things, common law fraud, negligent misrepresentation, and DTPA violations. Crithfield filed a special appearance arguing (1) he is not a Texas resident; (2) he did not have minimum contacts with Texas; and (3) even if he had some contacts, the exercise of jurisdiction over him would offend traditional notions of fair play and substantial justice. The trial court denied his special appearance.

### B. The Ventos

In 2005, Crithfield, purporting to act on behalf of Alliance Royalties, LLC, approached the Ventos about investing in income-producing oil and gas interests located throughout the Unites States and the Gulf of Mexico, which were offered by Noble. Noble is a Texas-based oil and gas royalties buyer and seller. The Noble royalties were to be acquired through five offerings made by Noble referred to as the Elk Horn Properties, Cottonwood Properties, Drake Properties, Premont Properties, and Teal Properties. Compass, a subsidiary of Noble and also headquar-

---

**3.** Crithfield claimed in a deposition that this statement was in error and "not artfully written."

tered in Dallas, was to manage the Alliance investments in Noble.

As to one of the five offerings made by Noble, Crithfield directed the transfer of approximately $3.8 million from WH & T to Noble for acquisition of the Premont Properties. He signed the Premont Properties Participation Agreement without any representative capacity for any Alliance entity. The participation agreement includes an "applicable law" section stating any disputes shall be resolved in Texas with venue in Dallas County.

The Ventos claim Crithfield represented that their investments in the Noble royalties, through Alliance Royalties, LLC, would be liquid. However, if the Ventos were unable to sell their royalty interest on the secondary market, Alliance Royalties, LLC would arrange to have them repurchased. As a result of Crithfield's representations, the Ventos funded a $10.6 million investment in interests from Noble through Alliance Royalties, LLC. Thus, the Ventos believed they were investing in royalty interests located in Texas and managed by a Texas entity.

The Ventos later discovered that Crithfield structured their investment in a different manner than agreed. Crithfield claimed that none of the Ventos' money was ever invested through Alliance Royalties, LLC in Noble. He alleged instead that Alliance Royalties, LLC invested in promissory notes of Alliance Royalties, Inc., a company in which he is the president, sole employee, and sole board member. In turn, Alliance Royalties, Inc. purchased royalty interests from Noble. According to Crithfield, Alliance Royalties, LLC did not and does not have any ownership interests in the Noble royalties the Ventos' are claiming right to.

The Ventos filed a third-party claim against Crithfield asserting various causes of action for fraud. Crithfield filed a special appearance arguing (1) he is not a Texas resident; (2) he did not have minimum contacts with Texas; and (3) even if he had some contacts, the exercise of jurisdiction over him would offend traditional notions of fair play and substantial justice. The trial court denied his special appearance. This interlocutory appeal followed.

## Standard of Review

■ When reviewing an order denying a special appearance, we review the trial court's factual findings for sufficiency of the evidence, but we review de novo its ultimate conclusions as to the propriety of personal jurisdiction. *Capital Tech. Info. Servs., Inc. v. Arias & Arias Consultores*, 270 S.W.3d 741, 747–48 (Tex.App.-Dallas 2008, pet. denied) (en banc). We review the trial court's findings of fact by the same standards that we apply in reviewing the evidence supporting a jury's answers. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex.1991).

In reviewing the legal sufficiency of a finding of fact, we consider only the evidence and inferences that support the challenged finding and disregard all contrary evidence and inferences unless the evidence could not be rejected by the fact finder. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005); *Petrie v. Widby*, 194 S.W.3d 168, 173 (Tex.App.-Dallas 2006, no pet.). In reviewing a factual sufficiency issue, we consider all the evidence. A finding will be set aside only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is wrong and manifestly unjust. *Petrie*, 194 S.W.3d at 173. The trial court, as fact finder, is the sole judge of witness credibility and may accept or reject all or any part of a witness's testimony. *Id.* Therefore, we do not pass on the witness's credibility or

substitute our judgment for that of the trial court. *Id.*

We independently review the trial court's conclusions of law, and we give limited deference to a trial court's application of law to facts. *Id.* at 174. The trial court abuses its discretion when it misapplies the law. *Id.*

### The Texas Long–Arm Statute

■ A Texas court may exercise jurisdiction over a nonresident if two conditions are satisfied. First, the Texas long-arm statute must authorize the exercise of jurisdiction. Second, the exercise of jurisdiction must be consistent with federal and due process guarantees. *Petrie,* 194 S.W.3d at 174. Further, the Texas long-arm statute permits Texas courts to exercise jurisdiction over a nonresident doing business in Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (West 2008). The definition of "doing business" in Texas includes committing a tort in whole or in part in Texas. *Id.* § 17.042(2).

### Sufficiency of the Pleadings

■ In his second issue, Crithfield contends the Boothes and the Ventos failed to satisfy their initial pleadings burden to bring him within the jurisdiction of the court. Personal jurisdiction concerns the power of the court to bind a particular person or party. *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996) (orig. proceeding). The plaintiff bears the initial burden of pleading jurisdictional facts sufficient to bring the defendant within the reach of the Texas long-arm statute. *Capital Tech. Info. Servs., Inc.,* 270 S.W.3d at 748. The specially appearing defendant must then negate all bases for personal jurisdiction alleged by the plaintiff. *Id.* If the nonresident defendant produces evidence negating personal jurisdiction, the burden returns to the plaintiff to show, as a matter of law, that the court has personal jurisdiction over the nonresident defendant. *Assurances Generales Banque Nationale v. Dhalla,* 282 S.W.3d 688, 695–96 (Tex.App.-Dallas 2009, no pet.).

Citing *Kelly v. General Interior Construction, Inc.,* 301 S.W.3d 653 (Tex.2010), Crithfield argues appellees' initial pleadings must allege the basis for the trial court's exercise of jurisdiction and they cannot rely upon facts presented in their "responses." Appellees respond they may carry their burden in the initial pleadings or in the responses to a special appearance. We agree with appellees.

We have held that a plaintiff may carry its initial burden of pleading sufficient allegations to invoke jurisdiction in its "original pleadings as well as its response to the defendant's special appearance." *Flanagan v. Royal Body Care, Inc.,* 232 S.W.3d 369, 374 (Tex.App.-Dallas 2007, pet. denied) (citing TEX.R. CIV. P. 120a(3) and *Ennis v. Loiseau,* 164 S.W.3d 698, 705 (Tex.App.-Austin 2005, no pet.)); *see also Boothe,* 329 S.W.3d at 120–21. Thus, the trial court could properly consider appellees' responses to Crithfield's special appearance when determining whether it had jurisdiction over Crithfield. Crithfield's arguments to the contrary are without merit. We now will address the pleadings of the Boothes and the Ventos individually.

### A. The Boothes

■ In their petition, the Boothes alleged common law fraud, negligent misrepresentation, and violations of the DTPA against Crithfield. While we agree they failed to specifically allege that any of Crithfield's actions underlying the basis of their suit occurred in Texas, the Boothes expanded their arguments in their response.

Concerning the allegation of fraud, negligent misrepresentation, and violations of the DTPA, the Boothes allege Crithfield sent a letter to their estate attorney in Dallas claiming sufficient funds supported the WH & T investments. The statements were intended to induce the Boothes into reinvesting with the Fixed 8 Fund and in reliance on the statements, they reinvested. They further allege Crithfield attended a meeting with them in Dallas in June of 2008 in which he made numerous misrepresentations including his assertion the royalties on the investments were paying two percent when in reality, they were returning approximately ten percent. Despite the small investment return, the Boothes requested Crithfield transfer the royalty interests in Noble to them. They eventually entered into a contract in which Crithfield represented Alliance Royalties, LLC owned the Noble interests, but in fact, Alliance Royalties, Inc. owned them. Thus, Alliance Royalties, LLC never owned any royalties it could transfer to the Boothes.

Based on these allegations, we conclude the Boothes satisfied their initial burden of pleading jurisdictional facts to bring Crithfield within the Texas long-arm statute, as he was "doing business" in Texas. *Compare Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 28 (Tex.App.-Houston [1st Dist.] 2010, no pet.) (holding party pleaded a connection between wrongful acts and Texas based on allegations that party made representations in Texas and the representations concerned the ongoing operations of two Texas entities), *with Baldwin v. Household Int'l, Inc.*, 36 S.W.3d 273, 277–78 (Tex.App.-Houston [14th Dist.] 2001, no pet.) (holding party failed to meet his initial burden of pleading when petition vaguely set out causes of action and did not allege where or when

the representations occurred); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042. We recognize the general principle that assertions of specific jurisdiction should be reviewed on a claim-by-claim basis. *See Syrian Am. Oil Corp. v. SSPD Petroleum Dev.*, 01–10–00224–CV, 2011 WL 1328373, at *6 (Tex.App.-Houston [1st Dist.] Feb. 24, 2011, no pet.). However, because the Boothes' claims are based on the same forum contacts, a separate analysis of each claim is not required. *Id.* Accordingly, we overrule his second issue to the extent he claims the Boothes failed to plead sufficient jurisdictional facts to bring him within the Texas long-arm statute.

## B. The Ventos

■ The Ventos allege fraud, statutory fraud, negligent misrepresentation, conversion, constructive trust, theft liability act, conspiracy to defraud, and alter ego. Similar to the Boothes, most of the Ventos' claims all arise from the same contacts. Specifically, they claim Crithfield made misrepresentations regarding the nature and liquidity of their investment in the Noble royalties. Crithfield represented their $10.6 million investment would be through Alliance Royalties, LLC without referencing Alliance Royalties, Inc. Later, the Ventos learned Crithfield used Alliance Royalties, Inc. to invest in the Noble royalties. The Ventos were unaware of Alliance Royalties, Inc., which is a corporation consisting solely of Crithfield. He is the president, the sole board member, and the sole employee.

The Ventos thought their money was being invested by Crithfield in Noble. Noble is a Texas-based corporation that specializes in "acquiring and managing valuable mineral and royalty properties with proven production histories and upside po-

tential."[4] Further, approximately fifty percent of the revenues paid by Noble to the Alliance entities and Crithfield were derived from oil and gas properties located in Texas and managed by a Texas company. Thus, according to the Ventos, they have been deprived of all royalty interests because Crithfield and the Alliance entities have received payment instead.

Because the crux of the underlying litigation involves representations Crithfield made regarding the liquidity and nature of royalty interests based in Texas and being managed by a Texas company, we conclude the Ventos have pleaded sufficient facts to bring Crithfield within the Texas long-arm statute for their fraud, statutory fraud, negligent misrepresentation, conversion, constructive trust, theft liability act, and conspiracy to defraud claims. *See Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333 (Tex.2009) (holding Retamco fulfilled its initial pleading requirement to bring Republic within the long-arm statute because oil and gas interests were from real property in Texas and the underlying litigation involved fraudulent transfer of the Texas property).

■■ As to their allegation of alter ego, the Ventos claim Crithfield has absolute control over the affairs of Alliance Royalties, Inc. because he is its sole employee and board member. Alliance Royalties, Inc. has no office but received its mail at Crithfield's personal P.O. Box. Further, Alliance Royalties, Inc.'s royalty payments have been paid allegedly to Crithfield's P.O. Box at his request.

■■ Courts have acknowledged that jurisdictional veil-piercing and substantive veil-piercing involve different elements of proof. *See PHC–Minden, L.P. v. Kimber-*

*ly–Clark Corp.,* 235 S.W.3d 163, 174 (Tex. 2007); *Daimler–Benz Aktiengesellschaft v. Olson,* 21 S.W.3d 707, 721 n. 5 (Tex.App.-Austin 2000, pet. dism'd w.o.j). This is so because personal jurisdiction involves due process considerations that may not be overridden by statute or common law. *PHC–Minden, L.P.,* 235 S.W.3d at 174; *see also Capital Fin. & Commerce AG v. Sinopec Overseas Oil & Gas, Ltd.,* 260 S.W.3d 67, 89 (Tex.App.-Houston [1st Dist.] 2008, no pet.). Thus, the court has noted that fraud, which may be vital to piercing the corporate veil, has no place in assessing contacts to determine jurisdiction. *PHC–Minden, L.P.,* 235 S.W.3d at 175. Instead, the court has outlined the following relevant factors for jurisdictional veil-piercing:

> To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary. But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice.

*Id.* (citing *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 799 (Tex.2002)); *see also Nichols v. Lin,* 282 S.W.3d 743, 747 (Tex.App.-Dallas 2009, no pet.) (noting alter ego applies when there is such a unity between a corporation and an individual that the separateness of the corporation has ceased and holding only the corporation liable would result in an injustice).

■■ The types of evidence a court will consider as proof of alter ego include: (1)

---

4. Alliance Royalties, LLC provides this description of Noble under "Account Descrip-tion" on its website.

the payment of alleged corporate debt with personal checks or other commingling of funds; (2) representations that the individual will financially back the corporation; (3) the diversion of company profits to the individual for his personal use; (4) inadequate capitalization; and (5) other failure to keep corporate and personal assets separate. *Nichols,* 282 S.W.3d at 747.

We conclude the Ventos failed to plead sufficient facts to sustain their burden of proof as to alter ego. While the Ventos argue Alliance Royalties, Inc. has no office but receives its mail at Crithfield's personal P.O. Box, Crithfield testified at a deposition that his wife also has access to the box and he uses it for "all kinds of things, personal and business, corporate." Thus, this evidence does not establish a commingling of funds, a diversion of profits for personal use, or other failure to keep assets separate. While they further allege he is the sole board member and employee of Alliance Royalties, Inc. and Crithfield himself testified he is its president, an individual's standing as an officer, director, or majority shareholder of an entity alone is insufficient to support a finding of alter ego. *Id.*

Moreover, we acknowledge that the trial court did not engage in a piercing of the corporate veil analysis or make any findings of fact or conclusions of law regarding alter ego. When the court files findings, the court of appeals can presume the omitted findings support the judgment only when (1) an element of the ground of recovery was included in the findings of fact, (2) the omitted element was not properly requested, and (3) the omitted finding is supported by the evidence. *See* Tex.R. Civ. P. 299; *see also Am. Nat'l Ins. Co. v. Paul,* 927 S.W.2d 239, 245 (Tex.App.-Austin 1996, writ denied). Here, because the trial court did not include any element of alter ego in its findings and such a finding would be unsupported by the evidence, we cannot presume the Ventos sufficiently pleaded alter ego to support the trial court's finding of personal jurisdiction over Crithfield.

Accordingly, we sustain Crithfield's second issue regarding the Ventos to the extent it involves alter ego. In all other respects, his second issue is overruled.

### Due Process Constraints

 Having determined the Texas long-arm statute authorizes the exercise of jurisdiction, we now must decide if the evidence of jurisdiction is consistent with due process. *Petrie,* 194 S.W.3d at 174. A defendant's contacts with the forum can give rise to specific or general jurisdiction. Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The activity must be purposefully directed at Texas so the defendant could foresee being haled into a Texas court. *Id.* at 474, 105 S.Ct. 2174. The number of contacts by the defendant is not controlling; rather, the importance lies with the quality and nature of the contacts.

 When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation. *Boothe,* 329 S.W.3d at 121. The test for minimum contacts depends on whether the plaintiff's claim relates to the defendant's contacts with Texas. Specific jurisdiction minimum contacts are present if (1) the defendant purposefully availed himself of the privileges of conducting activities in the forum state, and (2) there are substantial connections between those contacts and the operative facts of the litigation.

*Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 576, 585 (Tex.2007).

To discern whether a defendant has sufficiently "purposefully availed" himself of a forum, we consider three factors. First, we must disregard any forum contacts that resulted solely from the unilateral activity of another party or third party. *Michiana Easy Livin' Country v. Holten,* 168 S.W.3d 777, 785 (Tex.2005). Second, we consider whether the defendant's contacts with the forum are "purposeful" rather than "random, isolated, or fortuitous." Random, isolated, or fortuitous contacts are not sufficient to justify haling a defendant into the forum's courts. *Id.* Third, "availment" means the defendant must have sought some benefit, advantage, or profit by its forum-directed activities and invoked the benefits and protections of the forum's laws in some fashion. *Id.* It is the quality and nature of the contacts, rather than the number, that is important. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 809–10 (Tex.2002). In fact, even a single purposeful contact may, in a proper case, be sufficient to meet the requirement of minimum contacts when the cause of action arises from the contact. *Haught v. Agric. Prod. Credit Ass'n,* 39 S.W.3d 252, 258 (Tex.App.-Tyler 2000, no pet.).

If the court concludes that minimum contacts with the forum state exists, the court then proceeds to evaluate those contacts in light of five factors to determine if the assertion of jurisdiction comports with traditional notions of fair play and substantial justice. *Petrie,* 194 S.W.3d at 175. The five factors are (1) the nonresident's burden; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining an efficient resolution to disputes; and (5) the

state's common interest in furthering fundamental, substantive social policies. *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174. Once a court determines a nonresident defendant has purposefully established minimum contacts, only in rare instances will the exercise of jurisdiction not comport with traditional notions of fair play and substantial justice. *Petrie,* 194 S.W.3d at 175.

## Jurisdictional Analysis

In his first issue, Crithfield argues the trial court erred by denying his special appearance. In his third issue, he claims the evidence is insufficient to support the trial court's findings and its conclusions of law are erroneous. We will analyze his contacts with the Boothes and the Ventos separately.

### A. The Boothes

We begin our jurisdictional analysis by noting the Boothes allege Crithfield committed torts and made false representations to them while in Texas. While this is sufficient to satisfy the Texas long-arm statute, it does not end our analysis; rather, we must determine whether the exercise of jurisdiction comports with due process. Thus, we continue our analysis of Crithfield's interactions with the Boothes.

Although Crithfield challenges the sufficiency of the evidence to support many of the trial court's findings of fact and conclusions of law, he does not challenge all of them. Unchallenged findings of fact are binding on the appellate court, unless the contrary is established as a matter of law or there is no evidence to support the finding. *Walker v. Anderson,* 232 S.W.3d 899, 907 (Tex.App.-Dallas 2007, no pet.).

Crithfield has not challenged the fact he met with the Boothes in Texas in June of

2008. During the meeting, Crithfield represented the Boothes' investment, which was approximately $2,000,000 in the Fixed 8 Fund had been substantially depleted. Crithfield further indicated the only significant value remaining in the Fixed 8 Fund was the Noble royalties. Based on these representation, the Boothes asked for all the Noble royalties to be transferred to them directly. Crithfield challenges this particular finding by claiming there is no evidence he agreed to transfer the royalty interests directly to the Boothes. However, Dr. Boothe testified during his deposition that "it was a complete transfer of the royalties themselves, which we had discussed that I would pay for the transfer fees that would transfer the actual royalties themselves to us." Thus, the evidence supports this finding of fact.

The trial court further found that in response to Dr. Boothe's request, Crithfield represented the Noble royalties had only an investment return of approximately two percent, which was a false statement because the investment return at the time was approximately ten percent. Crithfield has not challenged this finding regarding the rate of investment return.

Despite the Fixed 8 Fund allegedly only returning two percent, the Boothes continued to insist on a transfer of the Noble royalties. Crithfield discouraged the transfer because of costs, but he eventually agreed.

In the agreements to transfer the royalty interests, Crithfield represented that Alliance Royalties, LLC owned the Noble interests but in fact, Alliance Royalties, Inc. owned them. Thus, Alliance Royalties, LLC never owned any royalties it could transfer to the Boothes. Further, Crithfield was the president, the sole director, and the sole employee of Alliance Royalties, Inc. Thus, the Boothes argue the contracts were merely an effort to hide the fact that royalty payments were being misdirected into Alliance Royalties, Inc. for Crithfield's benefit.

■ Here, Crithfield traveled to Texas to meet with the Boothes regarding their investments in the Fixed 8 Fund. Crithfield made the false representations underlying the Boothes' lawsuit while in Texas. Although Boothe could not say with certainty who or which entity Crithfield represented during the meeting, such a distinction is irrelevant for our analysis. A corporate officer is not protected from the exercise of specific jurisdiction, even if all of his contacts were performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct, directed at the forum state, for which he may be held personally liable. *See Ennis v. Loiseau,* 164 S.W.3d 698, 707 (Tex.App.-Austin 2005, no pet.); *see also Monterosso v. Vance,* 01–07–00972–CV, 2008 WL 4006763, at *6 (Tex.App.-Houston [1st Dist.] Aug. 28, 2008, no pet.) (mem. op.) (noting Texas courts have limited the use of the fiduciary shield doctrine to attempts to exercise general jurisdiction over a nonresident defendant). This is based on the well-established principle that a corporate officer is primarily liable for his own torts. *Id.*

■ The causes of action asserted by the Boothes against Crithfield, which are based on his alleged misrepresentations while in Texas, are claims for which he could be held individually liable. *See Monterosso,* 2008 WL 4006763, at 6. Therefore the fiduciary shield doctrine is not available as a defense to the trial court's exercise of specific personal jurisdiction. *Id.* Based on these facts, the trial court's findings and conclusions are supported by sufficient evidence.

Further, Crithfield purposefully availed himself of the laws of Texas, and a substantial connection between his contacts

and the operative facts of the litigation exists. *See Moki Mac River Expeditions,* 221 S.W.3d at 585 (holding "there must be a substantial connection between [the defendant's] contacts and the operative facts of the litigation"). The Boothes' causes of action are based on actions and representations made through a letter Crithfield sent to the Boothes' attorney in Texas confirming the Fixed 8 Fund was funded by sufficient assets and Crithfield's meeting in Dallas with the Boothes. His meeting with the Boothes was not random, and by making misrepresentations, he sought personal benefits and profits through the investments. The evidence at trial will necessarily include testimony and documentary evidence from these events. Thus, he should have realized the consequences of making such representations in Texas could reasonably lead to being haled into a Texas court. *See Petrie,* 194 S.W.3d at 175 (personal jurisdiction appropriate when party made false representations about stock ownership during meetings and visits to Texas). Therefore, the evidence is legally and factually sufficient to support the trial courts findings of fact and conclusions of law that Crithfield had minimum contacts with Texas.

Even when minimum contacts have been established, the trial court must still determine whether jurisdiction over the nonresident defendant will comport with traditional notions of fair play and substantial justice. *Boothe,* 329 S.W.3d at 127. Only in rare cases will the exercise of jurisdiction not comport with traditional notions of fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *Petrie,* 194 S.W.3d at 175.

The trial court correctly concluded exercising jurisdiction over Crithfield will not offend traditional notions of fair play and substantial justice. He has already shown his willingness to travel to Texas when he met with the Boothes to conduct business; therefore, we cannot conclude further travel to defend this lawsuit will be a burden to him. Moreover, distance alone is not ordinarily sufficient to defeat jurisdiction as "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *Guardian Royal Exch. Assurance Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 231 (Tex. 1991) (citing *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)).

Further, Texas has an interest in resolving this dispute as it involves alleged fraudulent statements made while in Texas to Texas residents regarding investment funds from real property partly located in Texas. *See, e.g., Retamco,* 278 S.W.3d at 341 ("Texas has an interest in resolving controversies involving real property within its borders."). Thus, the evidence is legally and factually sufficient to support the trial court's findings that (1) Crithfield could reasonably anticipate being haled into a Texas court for his actions, (2) forcing him to litigate in Texas will not be burdensome, and (3) Texas has a strong interest in resolving the disputes. Accordingly, the exercise of specific personal jurisdiction as to Crithfield for the Boothes' lawsuit will not offend traditional notions of fair play and substantial justice. We overrule Crithfield's first and third issues as to the Boothes.

### B. The Ventos

Although the Ventos have satisfied the Texas long-arm statute, we must now continue our analysis to determine whether exercising specific jurisdiction over Crithfield for their claims comports

with due process. In concluding the trial court properly denied his special appearance, we find *Retamco* instructive.

In that case, Retamco, a Texas corporation sued Paradigm Oil, Inc., another Texas corporation, for unpaid royalties related to oil and gas interests in Texas. 278 S.W.3d at 335. Retamco later amended its petition to include a claim against Republic Drilling Company, a California corporation, for violations of the Uniform Fraudulent Transfer Act. *Id.* Retamco claimed Paradigm assigned to Republic a 72% interest in Paradigm's oil and gas wells, which then left Paradigm insolvent and unable to satisfy Retamco's claims. *Id.* Republic filed a special appearance arguing the allegedly fraudulent assignment of the Texas leases occurred entirely outside of Texas; therefore, the cause of action did not arise from or relate to contacts with Texas and Texas could not assert jurisdiction over it. *Id.* at 336–37.

The court began its analysis by noting the defendant's activities, whether they consist of direct acts within Texas or conduct outside of Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court. *Id.* at 338 (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). It then determined that by taking assignment of Texas real property, Republic reached out and created a continuing relationship with Texas, and while Republic may not have actually entered Texas to purchase the real property, "jurisdiction ... may not be avoided merely because the defendant did not physically enter the forum state." *Id.* at 339 (citing *Burger King*, 471 U.S. at 476, 105 S.Ct. 2174). The property Republic acquired would always be in Texas, which created a continuing relationship based on its ownership. *Id.*

The court further noted the transferred asset was not fortuitous, but rather a fixed asset in Texas. Unlike *Michiana*, "we have no difficulty imagining just how Republic would benefit from the processes and protections of Texas law." *Id.* at 339–40. Republic was a willing participant in a transaction with an affiliated Texas company to purchase Texas real property. *Id.* Thus, Republic sought a "benefit, advantage, or profit" in Texas. *Id.* at 340. Such actions resulted in Republic purposefully availing itself of the privileges of conducting activities in Texas. *Id.* The court further concluded the real property itself (specifically the oil and gas interests) would be an "operative fact" of the litigation because without the asset, no fraudulent transfer could occur under the Uniform Fraudulent Transfer Act. *Id.* at 341. Thus, Republic had minimum contacts to support specific jurisdiction.

Here, according to his testimony at a temporary injunction hearing,[5] Dick Vento, a representative of the Ventos, received a phone call in 2005 in which Crithfield provided proposals for investments in CDO receivables in Noble. The Ventos invested approximately $10.6 million in what Crithfield said would be an eight percent return of investment. In fact, Crithfield admitted to using a power point presentation to market Alliance Royalties, LLC's invest-

**5.** The temporary injunction was filed by the Ventos against Alliance Royalties, LLC in the underlying lawsuit. Although Crithfield has objected to the supplementation of the record to include items from Alliance Royalties, LLC's special appearance, we have granted supplementation of the record. We do not agree with his argument that the trial court could not and did not focus on evidence from the previous parties' special appearances. The case involves multiple parties and multiple claims, and the trial court was free to consider all the evidence it had before it to determine if jurisdiction was appropriate.

ment opportunity with Noble. It claimed "Noble Royalties, Inc. of Dallas, Texas is one of the leaders in oil royalty programs" and ". . . experience indicates a rate of return in the range of 8% per annum." Crithfield could not say with certainty whether anyone with the Ventos had attended any of his presentations. Dick Vento testified, however, that in addition to the stated eight percent return of investment, Crithfield said the Noble investment was liquid but if the marketplace was not good, he would buy them back. Crithfield alleviated any concern about liquidity in investing in Noble.

Crithfield never mentioned Alliance Royalties, Inc. during their conversation. It was Ventos' understanding that the Ventos were investing in royalties coming from Noble. It was later learned that the Ventos invested in Alliance Royalties, LLC, which was supposed to invest in Noble. However, instead of investing the Ventos' money in Noble through Alliance Royalties, LLC, Crithfield, through a series of promissory notes, transferred the money to Alliance Royalties, Inc., who in turn received the royalties. The Ventos never received an annuity payment and instead, received letters from Crithfield saying the annuity payments could not be paid.

Dick Vento also testified that he would not have given Crithfield the money if he knew Crithfield was going to use it to buy royalty interest for Alliance Royalties, Inc., his own company. Thus, although Crithfield argues there is no evidence to support the trial court's finding that the Ventos thought they were investing in oil and gas royalties offered by Noble, Dick Vento's testimony provided sufficient evidence to support the finding.

Further, there is sufficient evidence to support the trial court's finding that more than fifty percent of the Noble royalties

are located in Texas. Dan Monticelli, the corporate representative of Compass (a wholly owned subsidiary of Noble also located in Texas), testified in a deposition that of the $8 million that had been paid out in royalties to Alliance Royalties, Inc., approximately half of them came from oil and gas properties located in Texas. Thus, similar to the facts of *Retamco*, there is no question Crithfield knew the royalty interests at issue were from land in Texas and distributed by a Texas-based entity. He was well-aware of the state's integral connection to the property interest at all times.

Crithfield's knowledge of the Texas connection to the royalty interests is further demonstrated by his signing the Premont Properties Participation Agreement. The Premont Properties is one of the five investments that was part of Noble's royalties that Compass managed on behalf of the Alliance entities and is in dispute in the underlying suit. The agreement contains a choice of law provision, which states "courts located in the State of Texas, state or federal, shall have exclusive jurisdiction to hear and determine claims, disputes, controversies, and actions arising from or relating to this Participation Agreement. . . ." Crithfield signed this contract without any indication that he was signing on behalf of any of the Alliance entities. In his deposition, when asked if there was any obvious representative capacity from his signature, Crithfield answered "There's nothing obvious from the signature." He further admitted his signature was not on behalf of any entity and recognized the Texas choice of law provision in the contract. Accordingly, the evidence is sufficient to support the trial court's finding that Crithfield signed the Premont documents with no indication of capacity and its conclusion he signed in his individual capacity.

A valid and enforceable forum selection clause in a contract will support the denial of a special appearance entered by a party to the contract. *See Godenick v. Mannatech, Inc.*, 05–09–00269–CV, 2010 WL 716421, at *1 (Tex.App.-Dallas March 3, 2010, no pet.) (mem. op.). Further, when an individual signs a contract without indicating he is signing in a representative capacity, he is liable on the contract. *Wright Group Architects Planners, PLLC v. Pierce*, 343 S.W.3d 196, 200–01 (Tex. App.-Dallas 2011, no pet. h.). Because Crithfield signed the Premont contract in his individual capacity and it contains a Texas forum selection clause, we conclude this is further evidence to support the trial court's conclusion that he "negotiated contracts, the situs of which is located in the State of Texas."

Thus, by creating an alleged scheme in which Alliance Royalties, Inc. received royalties from Noble, Crithfield was a "willing participant ... in a transaction to purchase Texas real property." *Retamco*, 278 S.W.3d at 340 (noting oil and gas interests are real property interests). As discussed above with the Boothes, Crithfield is not entitled to protection under the fiduciary shield doctrine; therefore, he can be held personally liable for his alleged fraudulent acquisition of interests in Texas oil and gas royalties. *Loiseau*, 164 S.W.3d at 707; *Monterosso*, 2008 WL 4006763, at *6. His actions were far from random or fortuitous. Moreover, Crithfield sought a "benefit, advantage, or profit" in Texas because at least some of the royalties he allegedly received came from assets in Texas. Thus, Crithfield has purposefully availed himself of the privilege of conducting activities in Texas. *See Retamco*, 278 S.W.3d at 340 (noting acceptance of valuable property interests in Texas is sufficient to establish that a defendant has sought to profit in Texas).

Crithfield's alleged liability also relates to his contacts with Texas. His alleged fraud and misrepresentations related to royalties from the oil and gas interests, located in Texas, will be operative facts of the underlying litigation. Without the Texas assets, the Ventos' claims fail. Accordingly, the Ventos have proven sufficient contacts by Crithfield to demonstrate that his alleged torts occurred at least, in part, in Texas. Thus, the evidence is sufficient to support the trial court's conclusions that Crithfield's contacts with Texas were sufficient, purposeful, and the lawsuit arises from and relates to his Texas contacts.

However, even when minimum contacts have been established, the trial court must still determine whether jurisdiction over the nonresident defendant will comport with traditional notions of fair play and substantial justice. *Boothe*, 329 S.W.3d at 127. Only in rare cases will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *Petrie*, 194 S.W.3d at 175.

The trial court correctly concluded exercising jurisdiction over Crithfield will not offend traditional notions of fair play and substantial justice. As noted above, he has already shown his willingness to travel to Texas; therefore, we cannot conclude further travel to defend this lawsuit will be a burden to him. *See Guardian Royal Exch. Assurance Ltd.*, 815 S.W.2d at 231. Moreover, we have previously upheld the trial court's denial of Alliance Royalties, LLC's special appearance in the underlying lawsuit, and Alliance Royalties, Inc. has not contested jurisdiction in Texas. *See Boothe*, 329 S.W.3d at 117. Based on his involvement in all the Alliance entities, it is reasonable to conclude he will be in Texas in some capacity on behalf of the

Alliance entities during the litigation. Further, given the complex nature of the claims, cross claims, and third party claims, all based on royalty payments from Texas property, the Ventos have an interest in resolving this controversy in Texas because that is where the litigation began. *See Boothe,* 329 S.W.3d at 128 (noting litigation began in Texas when Compass filed its interpleader action to determine whether Alliance Royalties, LLC or its investors owned the royalty interests in question). And finally, Texas has an interest in resolving controversies involving real property within its borders. *See, e.g., Retamco,* 278 S.W.3d at 341.

Accordingly, the exercise of specific personal jurisdiction as to Crithfield for the Ventos' lawsuit will not offend traditional notions of fair play and substantial justice. We overrule appellant's first and third issues as to the Ventos. Having determined Crithfield is subject to specific jurisdiction, we need not address the parties' arguments regarding whether Crithfield is subject to general jurisdiction in Texas.

### Judgment Supported By Findings and Conclusions

In his final issue, Crithfield asserts the trial court's judgment is not supported by the findings of fact and conclusions of law. Specifically, he claims "Interpleader parties did not allege and prove the facts necessary to establish this forum's general or specific jurisdiction over" him, and there are no findings and conclusions as to each specific elements of the appellees' causes of actions. However, we have previously concluded the Boothes satisfied their burden of pleadings. Further, the trial court's findings and conclusions are supported by evidence to support specific jurisdiction over Crithfield. Thus, the trial court's failure, if any, to make findings as to the specific

elements of each cause of action is irrelevant for determining personal jurisdiction and disposition of this appeal. *See, e.g., Michiana Easy Livin' Country, Inc.,* 168 S.W.3d at 792 (specific jurisdiction turns on defendant's contacts and not whether they were tortious); *EMI Music Mexico, S.A. de C.V. v. Rodriguez,* 97 S.W.3d 847, 856 (Tex.App.-Corpus Christi 2003, no pet.) ("When reaching a decision to exercise or decline jurisdiction based on the defendant's alleged commission of a tort, the trial court should examine only the necessary jurisdictional facts and should not reach the merits of the case."); *Arterbury v. Am. Bank & Trust Co.,* 553 S.W.2d 943, 948 (Tex.Civ.App.-Texarkana 1977, no writ) (noting ultimate liability is not a jurisdictional fact; therefore, the merits of the alleged cause of action are not at issue in the jurisdictional hearing). We overrule Crithfield's fourth issue.

### Conclusion

Having considered appellant's issues, we reverse the trial court's denial of Crithfield's special appearance to the extent it involves the Ventos' alter ego claim. In all other respects, the trial court's order is affirmed.